**UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| LANCELOT INVESTORS FUND, L.P., *et al.* | ) | Case No.  08-28225, *et al.* |
| | ) | (Jointly Administered) |
| Debtor. | ) | |
| | ) | Hon. Jacqueline P. Cox Presiding |
| ———————————————————— | ) | |
| | ) | |
| RONALD R. PETERSON, as Chapter 7 Trustee | ) | |
| for Lancelot Investors Fund, L.P., *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. _____ |
| | ) | |
| GREGORY BELL, LANCELOT INVESTMENT | ) | |
| MANAGEMENT LP, COLOSSUS CAPITAL | ) | |
| MANAGEMENT, LP, LANCELOT | ) | |
| MANAGEMENT, INC., and LANCELOT | ) | |
| HOLDINGS, LP | | |
| Defendants. | | |

**COMPLAINT**

Ronald R. Peterson (the "Trustee"), not individually, but as the Chapter 7 Trustee for the

estate of Lancelot Investors Fund, L.P., *et al.* (the "Debtors"), hereby complains as follows:

**NATURE OF THE ACTION**

1.       This is an adversary proceeding by the Trustee against Gregory Bell ("Bell"),

Lancelot Investment Management LP ("LIM"), Lancelot Management, Inc., Lancelot Holdings,

LP ("Lancelot Holdings"), and Colossus Capital Management, LP ("Colossus Management," and

with LIM, Lancelot Management, Inc., and Lancelot Holdings, the "Management Companies")

(collectively, "Defendants") on behalf of five hedge fund Debtors - Lancelot Investors Fund,

L.P., Lancelot Investors Fund II, L.P., Lancelot Investors Fund, Ltd., Colossus Capital Fund, L.P., and Colossus Capital Fund, Ltd. (together the "Funds").

2.      Prior to October 20, 2008, the date on which the Funds and their affiliated debtors filed for Chapter 7 protection in this Court, the Funds were controlled by Bell, through various levels of management companies set up by Bell.  Under applicable limited partnership and other agreements, the authority to make investment decisions on behalf of the Funds was delegated to Bell, through management companies controlled by Bell.  Bell made most of the significant investment, management, and operational decisions regarding the Funds.

3.      On information and belief, as of October 20, 2008, the Debtors collectively had assets with a book value of $1.8 billion.  Those assets were comprised predominantly of notes (the "Notes") purchased from a special purpose vehicle, Thousand Lakes, LLC ("Thousand Lakes"), which was controlled by and affiliated with Thomas J. Petters ("Petters") and Petters Company International ("PCI").  The Notes were purportedly secured by certain goods and merchandise owned by Thousand Lakes and/or certain vendors, Enchanted Family Buying Company ("Enchanted") or Nationwide International Resources ("NIR" and together the "Vendors").

4.      Bell and his Management Companies, through their own special purpose entity, RWB Services ("RWB"), served as commercial lenders to PCI by purchasing Notes from Thousand Lakes.  The Notes were issued by Thousand Lakes ostensibly to finance the purchase of consumer electronics and other so-called "brown goods" to fulfill alleged purchase orders from major retailers such as Sam's Club, Costco, Boscov's, and others (the "Retailers").  In fact, the Notes were issued in connection with a multi-billion dollar Ponzi scheme orchestrated by Petters and his co-conspirators.

5.      As part of the alleged scheme, Petters and his co-conspirators created fictitious invoices, purchase orders, and other documents, and used the money they had received from lenders such as the Funds to (a) make disbursements and other payments to earlier lenders, and (b) enrich themselves.

6.      As a result of the Ponzi scheme orchestrated by Petters and his co-conspirators, the goods and merchandise in which the Funds purportedly held a perfected security interest never existed and certain pre-existing binding purchase orders allegedly provided to Bell and the Funds are forgeries.  Accordingly, the Notes held by the Funds are worthless and the collateral allegedly pledged to the Funds as security for the Notes is nonexistent.

7.      From 2002 through 2008, Bell and the Management Companies raised more than $2.5 billion by selling interests in the Funds to hundreds of investors throughout the United States and in several foreign countries.  The investors included individuals, retirement plans, individual retirement accounts, trusts, corporations, partnerships, and other hedge funds.

8.      Bell, through his Management Companies, engaged in negligence in managing the Funds by failing to conduct sufficient investigations to verify the legitimacy of the activities of Thousand Lakes, Petters, and PCI and to confirm the validity of the collateral, security interests, and guarantees that were supposed to be obtained as security for repayment of the Notes.

9.      Beginning on or about February 26, 2008, after Thousand Lakes had been delinquent in repaying various Notes, Bell joined the Ponzi scheme.  Bell (through the Management Companies, including LIM) and Petters (through PCI) concocted a series of "roundtrip" payments to conceal Thousand Lakes' delinquencies.  On multiple occasions, Bell and his Management Companies, including LIM, sent Fund money directly to PCI under the

pretense that the money was for investment in a new Note.  PCI then returned the money to the

Funds' accounts, typically on the same day, to satisfy one or more outstanding Notes owed to the

Funds.

10.     Bell and Petters each have been charged criminally.  On October 7, 2009, Bell

pleaded guilty to a single count of wire fraud, in violation of 18 U.S.C § 1343, solely for his role

in the "roundtrip" payments that occurred in 2008.  On December 2, 2009, Petters was convicted

of twenty criminal counts, including mail and wire fraud, money laundering, and obstruction of

justice.

### JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) because this

adversary proceeding arises in, is related to, and arises under the Chapter 7 case, *In re Lancelot*

*Investors Fund, L.P., et al.*, pending in the United States Bankruptcy Court for the Northern

District of Illinois, Eastern Division, jointly administered as Case No. 08-28225.

12.     This Court has personal jurisdiction over Bell pursuant to 735 ILCS 5/2-209

because, among other things, he resides in Illinois, transacted business within Illinois, committed

tortious acts within Illinois, and breached fiduciary duties within Illinois.

13.     This Court has personal jurisdiction over the Management Companies pursuant to

735 ILCS 5/2-209 because, among other things, they transacted business within Illinois,

committed tortious acts within Illinois, and breached fiduciary duties within Illinois.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

15.     This Complaint is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## THE PARTIES AND RELATED ENTITIES

16.    Plaintiff Ronald R. Peterson is the Chapter 7 Trustee for the Debtors, duly appointed under 11 U.S.C. § 701(a)(1) of the United States Bankruptcy Code by Orders of this Court dated October 20, 2008.

17.    The Debtors consist of 19 related entities engaged in the operation of related hedge funds or special purpose vehicles.  As set forth in the following chart, each of the Debtors was ultimately controlled by Bell, through various levels of management companies set up by Bell.



18.    Defendant Bell (a/k/a Gregory Belinkov) is a citizen of the State of Illinois, residing in Highland Park.  Bell is the sole principal owner of the Management Companies and

had exclusive discretionary authority over the assets of the Funds. Bell personally represented, either as the agent, director, manager, or partner, each of the Funds, the Management Companies, and various affiliates.

19.     Defendant Lancelot Investment Management LP (f/k/a Lancelot Investment Management, LLC) (previously defined as "LIM") is a Delaware limited partnership, with its principal place of business located in Illinois.

20.     Defendant Lancelot Management, Inc. is a Delaware corporation, with its principal place of business located in Illinois.

21.     Defendant Lancelot Holdings is a Delaware corporation, with its principal place of business located in Illinois.

22.     Defendant Colossus Management is a Delaware limited partnership, with its principal place of business located in Illinois.

23.     Lancelot Investors Fund, LP ("Lancelot I"), one of the Debtors, was formerly known as Granite Investors Fund, L.P. and is a Delaware Limited Partnership, with its principal place of business in Northbrook, Illinois. Lancelot I was organized in September, 2001. LIM was the General Partner and Investment Manager of Lancelot I.

24.     Lancelot Investors Fund II, LP ("Lancelot II"), another of the Debtors, is also a Delaware Limited Partnership, with its principal place of business in Northbrook, Illinois. Lancelot II was organized in February 2003. LIM was the General Partner and Investment Manager of Lancelot II.

25.     Lancelot Investors Fund., Ltd. ("Offshore Lancelot"), another of the Debtors, was formerly known as Granite Investors Fund, Ltd. Offshore Lancelot was incorporated in 2002 in

the Cayman Islands, with its principal place of business in Northbrook, Illinois. LIM was the Investment Manager of Offshore Lancelot.

26.     Petters is a citizen of Minnesota residing in Wayzata, Minnesota. Petters, through various entities, held a substantial ownership interest in numerous businesses, including Polaroid Corporation, Sun Country Airlines, catalog retailer Fingerhut, and magazine publisher Great Waters Media. Petters managed all of these businesses under the umbrella company Petters Group Worldwide, LLC, a Delaware limited liability company with its principal place of business in Minnetonka, Minnesota.

27.     Other entities affiliated with Petters include: PCI, a Minnesota corporation with its principal place of business in Minnetonka, Minnesota; Edge One, LLC; MGC Finance Inc.; PAC Funding, LLC; PC Funding, LLC; PL Ltd., Inc.; and Thousand Lakes (collectively with Petters, the "Petters Entities").

28.     Enchanted Family Buying Company was a shell company with no real operations. Petters represented to his lenders, including the Funds, that with Petters' financial assistance, Enchanted bought consumer electronics from suppliers and sold them to Retailers.

29.     Like Enchanted, Nationwide International Resources was a shell company with no real operations. Petters represented to his lenders, including the Funds, that with Petters' financial assistance, NIR bought consumer electronics from suppliers and sold them to Retailers.

## BACKGROUND

### The Petters Ponzi Scheme

30.     Beginning in approximately 1995, Petters and certain of the Petters Entities began raising money by offering and selling promissory notes to members of the public.

31.     Petters offered and sold the notes to various feeder funds, which in turn raised their capital from hundreds of private lenders located throughout the United States and numerous

foreign countries.  The Funds were among the many hedge funds to which the Petters Entities offered and sold notes over the years.

32.     In offering and selling notes, Petters represented to lenders and potential lenders that the proceeds from the sale of the notes would be used to finance so-called purchase order financing.

33.     Purchase order financing allows vendors to obtain immediate payment for goods that have been pre-sold to creditworthy retailers.  Under Petters' version of purchase order financing, Petters and the Petters Entities arranged for the sale and delivery of end runs or overstock consumer electronics from manufacturers or suppliers to certain "Big Box" retailers such as Sam's Club, Costco, and Boscov's.

34.     Specifically, Petters represented that he worked with two companies, Enchanted and NIR, which bought the consumer electronics from suppliers and then resold the goods to Retailers.

35.     On information and belief, Petters represented that these transactions usually took up to 180 days to complete; according to Petters, while the suppliers demanded payment in advance, the Retailers would not pay until the merchandise was delivered.  Thus, financing was necessary to bridge the period between when the suppliers demanded payment and when the Retailers paid for the merchandise.

36.     For each transaction, Petters and his accomplices provided a series of documents to their lenders.  These documents included a funding request from PCI or its affiliates, executed note documents reflecting the loan and a guaranteed rate of return, purported purchase orders from a Retailer, purported bills of sale from the vendors, and documents assigning a security interest in the underlying merchandise to the financing lenders.

37.     In fact, Petters' entire "purchase order financing" business was a multi-billion dollar Ponzi scheme.

38.     There were no Retailers.

39.     No one ordered any merchandise through PCI, its affiliates, Enchanted, or NIR.

40.     Instead, Petters and his affiliates created fictitious invoices, purchase orders, and other documents, and used the money they had received from lenders to (a) make disbursements and other payments to earlier lenders, and (b) enrich themselves.

41.     The two Vendors -- Enchanted and NIR -- were shell companies with no real operations.  Indeed, the principals of the Vendors were associates of Petters.  They knew there were no Retailers and no real orders to buy merchandise.

42.     Each Vendor opened a bank account at the request of Petters.  The Vendors deposited monies wired to them from lenders of Petters (including the Funds), took a percentage of that money as compensation for their role in the scheme, and returned the rest to Petters.

43.     The principals of both Enchanted and NIR pleaded guilty in October 2008 to charges of conspiracy to commit money laundering.

**Petters and Bell Begin Their Relationship**

44.     Until 2002, Bell worked for a hedge fund in Florida called Epsilon Investment Management, LLC ("Epsilon").  On information and belief, Petters approached Epsilon about lending money to Petters and his affiliates.

45.     Before Bell permitted Epsilon to lend money to Petters, he caused Epsilon to hire Arthur Andersen to investigate Petters.  After receiving Arthur Andersen's assurances that Petters was a legitimate company, Epsilon loaned money to Petters and/or PCI.

46.     While Bell was employed by Epsilon, Petters and Bell discussed the idea of Bell starting his own hedge fund and loaning money to Petters.

47.     Bell decided to pursue the idea and, while still employed by Epsilon, found seed financing from a pair of Chicago-area investors named Dan Asher and Thane Ritchie.

48.     Thereafter, Bell organized the predecessors to LIM, Lancelot I, and Offshore Lancelot, and made his first loans to Petters and PCI.

49.     In January 2003, Bell organized Lancelot II and continued to purchase PCI notes.

**Structure of the Funds**

50.     Before October 20, 2008, the date on which the Debtors filed for Chapter 7 protection in this Court, Bell controlled the Funds through his ownership of the Management Companies.

51.     Under applicable partnership and offering documents, the authority to make investment decisions on behalf of the Funds was delegated to Bell, through the Management Companies he created and managed.  In fact, Bell made most significant investment, management, and operational decisions for the Funds.

52.     Bell is the principal owner of the Management Companies, including the 100% interest owner in Lancelot Management, Inc., the general partner and sole manager of LIM and Colossus Management.

53.     LIM is the general partner of Lancelot I and Lancelot II, and the investment manager of Offshore Lancelot.  Together, Lancelot I, Lancelot II, and Offshore Lancelot comprise the "Lancelot Funds."

54.     Similarly, Colossus Management is the general partner of Colossus Capital Fund, L.P., and the investment manager of Colossus Capital Fund, Ltd. (together, the "Colossus Funds").

55.     Bell personally represented, either as the agent, director, manager, or partner, each of the Funds, the Management Companies, and various special purpose affiliates.

56.     As manager of LIM, for example, Bell was authorized to "manage the business of [LIM]" and had "all powers and rights necessary, appropriate, or advisable to effectuate and carry out the purposes and business of [LIM]."  (Ex. 1, Limited Liability Company Operating Agreement of Granite Investment Management, LLC, § 7(d).)

57.     To that end, Bell had "full, exclusive and complete discretion, power and authority . . . to manage, control, administer and operate the business and affairs of [LIM] . . . and to make all decisions affecting such business and affairs."  (*Id.* § 7(e).)

58.     In exercising those powers, Bell had numerous duties, including without limitation to "devote such time to the business and affairs of [LIM] as is necessary to carry out [his] duties" and to ensure that the business dealings and undertakings of [LIM] "shall be at arm's length and on commercially reasonable terms."  (*Id.* § 7(j)(i-ii).)

59.     As manager of LIM, Bell also had certain duties to the Funds.

60.     As general partner of Lancelot I, Bell (as manager of LIM) was solely authorized to manage, operate, and determine policy for the fund.  (*See, e.g.*, Ex. 2, Limited Partnership Agreement of Lancelot Investors Fund, § 7.1.)

61.     To that end, the Limited Partnership Agreement provided that Bell "shall have the authority and power on behalf and in the name of the Partnership to perform all acts and enter

62.    In exercising that authority, Bell was obligated to:

use [his] best efforts in connection with the purposes and objectives of the Partnership and to devote to such purposes and objectives such of [sic] its time and activity (and the time and activity of its employees) during normal Business Days and hours as it in its discretion shall deem necessary for the management of the affairs of the Partnership . . . .

(*Id.* § 7.2(a).)

63.    As manager of LIM, Bell had similar obligations to Lancelot II.

64.    As manager of Colossus Management, Bell had similar obligations to Colossus Capital Fund, L.P.

65.    The Memorandum and Articles of Association of Lancelot Investors Fund, Ltd. provides that the business of Offshore Lancelot "shall be managed by the Directors."  (Ex. 3, Memorandum & Articles of Association of Granite Investors Fund, Ltd., ¶ 83.)

66.    The Directors of the Offshore Lancelot Fund appointed Bell, the sole principal of LIM, as the fund's Investment Manager.   The Investment Manager was responsible for "conducting all investment management operations of the [Offshore] Fund."  (*See, e.g.*, Ex. 4, 2003 Offshore Lancelot CIM, at 1.)

67.    As manager of Colossus Management, Bell had similar obligations to Colossus Capital Fund, Ltd.

68.    Bell also had duties to each of the Funds created by operation of law.

69.    Bell and LIM were investment advisers to the Lancelot Funds and owed the Lancelot Funds a fiduciary duty.

70.     Bell and Colossus Management were investment advisers to the Colossus Funds and owed the Colossus Funds a fiduciary duty.

71.     Moreover, as detailed below, the Confidential Information Memoranda ("CIMs") distributed to the Funds' investors contain express statements, promises, and representations as to how Bell, through the Management Companies, was required to operate the Funds. Specifically, the CIMs described the steps that Bell, through the Management Companies, was required to take to protect the Funds.

**The Confidential Information Memoranda**

72.     From 2001 to September 2008, Bell and the Management Companies raised more than $2.5 billion by selling interests in the Funds to hundreds of investors located throughout the United States and in several foreign countries.  The investors included individuals, retirement plans, individual retirement accounts, trusts, corporations, partnerships, and other hedge funds.

73.     To induce investments in the Funds, potential investors were given copies of CIMs.  As examples, the December 1, 2003 CIM for Offshore Lancelot (the "2003 Offshore Lancelot CIM") is attached as Exhibit 4.  The March, 1 2006 CIM for Offshore Lancelot (the "2006 Offshore Lancelot CIM") is attached as Exhibit 5.  The January 1, 2006 CIM for Lancelot I (the "2006 Lancelot I CIM") is attached as Exhibit 6.  The January 1, 2006 CIM for Lancelot II (the "2006 Lancelot II CIM"), is attached as Exhibit 7.

74.     According to the CIMs, the "principal investment strategy" to be employed by the Funds was Purchase Order Financing.  (*See, e.g.*, 2006 Lancelot I CIM, at 6.)  The vast majority of investments made by the Funds were purchases of Notes from Thousand Lakes.

75.     Generally, Lancelot I and Lancelot II purchased Notes directly from Thousand Lakes.  Offshore Lancelot purchased Notes from Lancelot I and Lancelot II that had been purchased initially from Thousand Lakes.

76.     The Notes were issued by Thousand Lakes ostensibly to finance the purchase of consumer electronics for resale to Retailers.

77.     The name of Thousand Lakes was not disclosed to investors in the Funds. Instead, investors were told that (a) the Notes purchased by the Funds would evidence loans made to one or more independently controlled special purpose vehicles that engaged in the business of acquiring consumer electronics and selling such goods to the Retailers, and (b) the Funds could not disclose certain information, such as the name of the counter-party to the Notes, because that information was proprietary and maintaining the confidentiality of that information was in the best interests of the Funds.  Indeed, the CIMs refer to the Note sellers simply as the "SPVs."

78.     To induce investments, Bell distributed an "Executive Summary" to certain investors.  The Executive Summary contained a diagram called the Illustrative Transaction Flow Chart (the "Flow Chart").  The diagram represented the flow of funds in a Note purchase by the Funds from Thousand Lakes.  Specifically, the flow was to occur as follows:

- Lancelot would fund a Note after a binding agreement between the distributor (Nationwide or Enchanted) and the Retailer was in place.

- Lancelot would fund 80-90% of the deal into Thousand Lakes, while 10-20% of the deal would be funded by Petters or PCI.

- Thousand Lakes was supposed to transfer the money directly to the Vendors; no money would be transferred to PCI until the transaction was complete.

- The Retailer would remit funds directly to Thousand Lakes' account, which the Funds would solely control.

14

- The Funds would transfer the Vendor's share of the proceeds to the Vendor.

- Lancelot would carry credit insurance and property and casualty insurance.

79.     The Flow Chart is attached as Exhibit 8.

80.     In the CIMs and other Agreements, and in conversations with investors, Bell, through the Management Companies, represented that he had taken steps to protect the Debtors' assets.

81.     Consistent with the Executive Summary, Bell, through the Management Companies, explicitly agreed to "originate Notes based on the terms of the Note, the terms of the Purchase Order, the character of the Underlying Goods, the sufficiency of the collateral, the identity of the Retailer and the availability of credit insurance with respect to the Retailer." (2006 Lancelot I CIM, at 7.)

### Pre-existing, Binding Purchase Orders

82.     Bell, through the Management Companies, agreed to ensure that the Debtors would purchase Notes from Thousand Lakes *only* if there was a pre-existing, binding purchase order with a retailer.

83.     As an example, the 2006 Lancelot II CIM describes the security to be provided for the Notes in the following manner:

> The Fund will purchase Notes only in circumstances where the SPV has a pre-existing, binding agreement with a Retailer to sell the Underlying Goods to such Retailer on a future date (a "Purchase Order"). As a result of such Purchase Orders, the Fund will assume little or no inventory risk with respect to the Underlying Goods. In general, a Note purchased by the Fund will finance up to 80% of the sale price of the Underlying Goods purchased by the SPV in a particular transaction; however, the Fund reserves the right to purchase Notes that finance in excess of 80% of the sale price of the Underlying Goods and the receivables arising therefrom. With respect to each Note purchased by the Fund, the Fund will require collateral generally equal to 120% of

the value of the Note. The Fund will have a security interest in the Underlying Goods which will be protected through the use of a proof of encumbrance filing under Article 9 of the Uniform Commercial Code. In addition to its security interest in the Underlying Goods, each Note purchased by the Fund will be guaranteed by the SPVs principals and/or affiliates of the SPV.

(2006 Lancelot II CIM, at 6.)

### *Security in the Collateral*

84.     Bell, through the Management Companies, agreed to ensure that the Funds obtained collateral equal to 120% of the value of each Note purchased from Thousand Lakes. (*See, e.g.*, 2006 Offshore Lancelot CIM, at 7.)   For notes prior to 2006, Bell, through the Management Companies, had agreed to ensure that the Funds obtained collateral equal to 150% of the value of each Note purchased from Thousand Lakes.  (2003 Offshore Lancelot CIM, at 7.)

85.     Moreover, Bell, through the Management Companies, agreed to ensure that the Funds had a security interest in the Underlying Goods protected through the use of Proof of Encumbrance filed under Article 9 of the Uniform Commercial Code.  (2006 Offshore Lancelot CIM, at 7.)

### *Guarantee*

86.     Bell, through the Management Companies, agreed to ensure that each Note purchased from Thousand Lakes was guaranteed by a valid, enforceable guarantee from Thousands Lakes' principals and/or its affiliates, including PCI.  (*Id.*, at 7.)

### *Monitoring*

87.     Bell, through the Management Companies, undertook a duty to monitor all of transactions underlying the purchase order financing.

88.     To satisfy those obligations, Bell was required to examine the purchase orders

purportedly executed for the sale of Underlying Goods in order to understand Thousand Lakes'

obligations thereunder.

89.     Indeed, the CIMs specifically required that

"[p]rior to purchasing a Note, the Investment Manager [or General
Partner] will examine the Purchase Order for the sale of the
particular Underlying Goods by the [Thousand Lakes] to the
Retailer.  The Investment Manager will select Notes to offer to the
Fund for purchase based on the terms of the Note, the terms of the
Purchase Order, the character of the Underlying Goods, the
sufficiency of the collateral, the identity of the Retailer and the
availability of credit insurance with respect to the Retailer."

(*Id.*)

90.     Further, the CIMs required that

"[a]fter a Note is purchased, an affiliate of the Fund or Investment
Manager will monitor [Thousand Lakes] and the Retailer during
the duration of the Note.  In particular, [Thousand Lakes] will be
monitored to confirm that [Thousand Lakes] satisfies its
obligations under the Purchase Order including, without limitation,
the delivery of the Underlying Goods to the Retailer, and the
payment by the Retailer to [Thousand Lakes] of the purchase price
of the Underlying Goods, all in accordance with the requirements
set forth in the Purchase Order."

(*Id.*, at 8.)

### *The Lock-Box*

91.     The CIMs stated that the Funds required a lock-box arrangement with Thousand

Lakes that was intended to give the Funds control over Thousand Lakes' bank accounts:

[I]n general the Funds will have a "lock-box" arrangement with the
SPV, pursuant to which the Fund will have control over the SPV's
bank account into which the Retailer will pay the purchase price
for the Underlying Goods, which is designed to protect the Fund
from the SPV using such proceeds for any other purpose prior to
satisfying the SPV's obligations under the Note.

(*Id.* at 7.)

92.     The Retailers were to pay the purchase price for the Underlying Goods directly into the lock-box.  The Funds were then to be paid directly from the lock-box, with any residual funds sent to PCI.  Accordingly, at no time were the Funds to receive repayments directly from Petters or PCI.

**The Petters Scheme Is Exposed**

93.     On September 24, 2008, FBI agents raided Petters' home and a number of his businesses.  The search warrant authorizing the raid details a scheme by Petters and his co-conspirators to defraud investment funds and other entities that provided loans and financing to his companies.  On December 2, 2009, Petters was convicted on 20 criminal offenses, including mail and wire fraud, money laundering, and obstruction of justice.

94.     On July 10, 2009, FBI agents took Bell into custody after obtaining a warrant for his arrest to answer a criminal complaint against him.  According to the Hovey Affidavit, Bell engaged in a series of "round-trip" transactions in an effort to conceal Thousand Lakes' delinquencies.  The Hovey Affidavit further states that in 2008, Thousand Lakes ceased wiring money to NIR and Enchanted in contravention of the instructions on the Notes, and instead wired money directly to PCI.

95.     On October 7, 2009 Bell pleaded guilty to a single count of wire fraud, in violation of 18 U.S.C § 1343.  A copy of the plea agreement is attached as Exhibit 9.

**Bell's Failure to Fulfill His Duties**

96.     Contrary to his obligations, undertakings, and/or representations, Bell, through the Management Companies, negligently failed to protect the Funds.

97.     Bell, through the Management Companies, failed to ensure that the Funds purchased Notes from Thousand Lakes only in circumstances where Thousand Lakes and/or the Vendors had a genuine, pre-existing, binding purchase order with a retailer.

98.     Bell, through the Management Companies, failed to monitor or confirm the delivery of Underlying Goods from the Vendors to the Retailers.

99.     Bell, through the Management Companies, failed to monitor Thousand Lakes, the Vendors, and the Retailers during the duration of the Notes purchased by the Funds from Thousand Lakes.

100.    Bell, through the Management Companies, failed to confirm payment by the Retailers of the purchase price for the Underlying Goods.

**The "Round-Trip" Transactions**

101.    Bell joined the Petters Ponzi scheme on or about February 26, 2008.

102.    On information and belief, in late 2007, a former PCI executive had a telephone conference with Lancelot executive Harold Katz in which Katz told the PCI executive that Lancelot wanted to wait until certain Costco invoices were "caught up" before Lancelot would send any new money.

103.    Also on information and belief, in early 2008, Bell told this same PCI executive that the Funds would wire money to the Petters Entities so that the executive "could pay invoices, and that the [executive] would pay the invoices and wire the money back to [the Funds]."

104.    To that end, starting in late February 2008, Bell caused the Funds to initiate at least 67 transactions where investor money was effectively used to satisfy Thousands Lakes' payment obligations to the Funds under various Notes.

105.    For each of these 67 transactions, the Funds wired money to PCI purportedly to purchase a Note from Thousand Lakes.  Then, within hours, PCI wired an almost identical amount of money to the Funds purportedly to satisfy obligations under an earlier note.

106.    Between February and April 2008, on each occasion when the Funds purchased a new Note from PCI, payments were made by PCI to the Funds in an amount similar to the new note amount.  For example, on February 26, 2008, Lancelot entered into an agreement with PCI to purchase a note for $17,000,000.  That same day, PCI remitted four payments to Lancelot totaling $17,045,051.25 purportedly to pay earlier notes.  On the following day, February 27, 2008, Lancelot purchased a new note for $20,000,000 from PCI.  PCI remitted four payments on the same day which totaled $20,224,990.

107.    Beginning in May 2008, some payments from PCI were sent on the same day and some were on the day following the issuance of a new note.  For example, on May 1, 2008, $20,400,000 was wired to PCI for a new note. On May 1, 2008, PCI wired $16,430,634 to Lancelot, and on May 2, $4,015,312.50 was wired to Lancelot.  The two incoming wires total $20,445,946.50.  Similarly on May 9, 2008, PCI was issued a $29,700,000 note.  Incoming funds from PCI to Lancelot on May 9 totaled $24,464,421.50.  A payment of $5,263,141.25 was made on May 12.  These two payments totaled $29,727,562.75.

108.    The last note was purchased on September 17, 2008, in the amount of $13,700,000.  Incoming funds from PCI to Lancelot that day totaled $13,796,271.60.

109.    During the period from February to September 2008, the total amount of cash that originated from Lancelot Investors LP to PCI on new notes was $1,377,050,000.   The total amount of cash received by Lancelot from PCI was $1,391,708,410.

**Payments to Insiders**

110.    Under the Limited Partnership and other agreements, Bell was compensated in two ways.  First, Bell's capital accounts were supposed to be allocated, on a quarterly basis, an amount equal to 20% of "New Investment Profits," (Limited Partnership Agreement of Lancelot Investors Fund, § 4.3(a)), which are defined as the "Investment Profits," or "the increase in the Net Asset Value" of the Funds reduced by any "deemed distributions or other deductions for such period," (*id.*, §1.21.), and any "Unrecouped Prior Losses."  (*Id.*, § 1.27.)  Second, Bell was to be compensated through the receipt of a quarterly management fee equal to 0.5% (2% annually) of the Funds' net asset value.  (*Id.*, §7.3(b).)

111.    According to the Debtors' pre-petition annual reports, from 2002 to January 5, 2008, the Funds paid at least $77,174,531 in management and performance fees to the Management Companies.  In addition, the Debtors accrued at least $104,149,254 in additional performance and management fees to the Management Companies.

112.    On February 13, 2008, Bell made a pair of identical transfers of $11,706,155 from an account he held jointly with his wife to the Gregory Bell Revocable Trust and the Inna Goldman Revocable Trust, respectively.   The approximately $23 million Bell transferred previously had been transferred into Bell's account from an LIM account and had been originally obtained from the Funds.

113.    Bell also improperly took money directly from the Funds.  On April 9 and 10, 2008, Gregory Bell transferred $5,682,996 from Lancelot I and Lancelot II to a personal account he held jointly with his wife, Inna Goldman.

114.    Bell also caused the Funds to make payments to various preferred insiders, including Thane Ritchie and Dan Asher.

## COUNT ONE
### Negligence (against all Defendants)

115.    The Trustee restates and realleges paragraphs 1-100 and 110-114 as though fully set forth herein.

116.    The Defendants owed the Funds a duty to act in good faith and a duty to exercise their business judgment in the best interests of the Funds, using reasonable diligence.

117.    The acts and omissions of the Defendants detailed in paragraphs 1-100 and 110-114, above, constitute negligence and a breach of duties owed by Defendants to the Funds.

118.    But for the acts and omissions of Defendants, the Funds could have avoided massive losses by revealing the Ponzi scheme orchestrated by Petters and the Petters Entities.

119.    Accordingly, Defendants injured the Funds in an amount to be determined at trial, but no less than $1.5 billion, the amount the Funds loaned to Thousand Lakes that has not been repaid.

## COUNT TWO
### Gross Negligence (against all Defendants)

120.    The Trustee restates and realleges paragraphs 101-109 as though fully set forth herein.

121.    Defendants owed the Funds a duty not to put their own interests above the interests of the Funds and the investors, a duty to act in good faith, and a duty to exercise their business judgment in the best interests of the Funds, using reasonable diligence.

122.     The acts and omissions of Defendants to concoct a series of "round-trip transactions," as detailed in paragraphs 101-109, constitute gross negligence and a breach of duties owed by Defendants to the Funds.

123.     But for the acts and omissions of Defendants, the Funds could have avoided massive losses by revealing the Ponzi scheme orchestrated by Petters and the Petters Entities.

124.     Accordingly, Defendants injured the Funds in an amount to be determined at trial, but no less than $1.5 billion, the amount the Funds loaned to Thousand Lakes that has not been repaid.

### COUNT THREE

**Breach of Fiduciary Duty (against Bell)**

125.     The Trustee restates and realleges paragraphs 1-100 and 110-114 as though fully set forth herein.

126.     Bell, through the Management Companies, owed the Funds (i) a fiduciary duty; (ii) a duty not to put his own interests above the interests of the Funds and the investors; and (iii) a duty to act in good faith and to exercise his business judgment in the best interests of the Funds, using reasonable diligence.

127.     The acts and omissions of Bell detailed in paragraphs 1-100 and 110-114, above, constitute multiple breaches of Bell's fiduciary duties to the Funds.

128.     Accordingly, all management fees, performance allocations or other compensation of any kind paid or credited to Bell, through the Management Companies, should be forfeited and must be returned to the Funds.

129.     To the extent Bell has received any other distributions, dividends, withdrawals, salary, compensation or payments of any kind from the Funds, all such payments or compensation were received in connection with, and during the existence of, Bell's breach of his

fiduciary duties to the Funds. Accordingly, all such payments and compensation should be forfeited and must be returned to the Funds.

130.    Bell failed to conduct investigations required by ordinary prudence and which, if undertaken, could have avoided massive losses to the Funds by revealing the scheme orchestrated by Petters and his co-conspirators.

131.    Accordingly, Bell injured the Funds in an amount to be determined at trial, but no less than $1.5 billion, the amount the Funds loaned to Thousand Lakes that has not been repaid.

## COUNT FOUR

### Unjust Enrichment (against Bell)

132.    The Trustee restates and realleges paragraphs 1-100 and 110-114, as though fully set forth herein.

133.    Bell has unjustly enriched himself by receiving numerous distributions, dividends, withdrawals, salary, compensation and other payments from the Funds and/or the Management Companies.

134.    Bell has unjustly retained those benefits to the detriment of the Funds and their investors.  All such monies in the hands of Bell are due to be repaid to and for the benefit of the Funds.

135.    Bell's retention of the benefits violates the fundamental principles of justice, equity, and good conscience.

136.    The Trustee seeks to receive the value of the benefits Bell has unjustly retained in an amount to be determined at trial.

## COUNT FIVE

### Alternatively, Avoidance and Recovery of Preferences
### Pursuant to §§ 547(B) and 550(A) of the Bankruptcy Code (against all Defendants)

137.    Count Five is alleged in the alternative to Counts I-IV.  The Trustee restates and realleges paragraphs 1 through 114, as though fully set forth herein.

138.    On or within 365 days prior to October 20, 2008, Debtors transferred to Defendants an amount to be determined at trial.

139.    Each such transfer was made for the benefit of the Defendants.

140.    The Defendants were insiders.

141.    Each such transfer was made on account of an antecedent debt owing from Debtors to Defendants.

142.    Each such transfer was made while Debtors were insolvent.

143.    Each such transfer enabled Defendants to receive more than they would have received if that transfer had not been made, and if Defendants had received payment of the debt underlying that transfer to the extent provided by the provisions of the Bankruptcy Code.

144.    Pursuant to 11 U.S.C. § 547(b), the Trustee is entitled to avoid each such transfer.

145.    Pursuant to 11 U.S.C. § 550(a)(1), the Trustee is entitled to recover each such transfer, or the value thereof, avoided by this Count.

## COUNT SIX

### Avoidance and Recovery of Constructively Fraudulent Transfers Pursuant To
### §§ 548(A)(1)(B) And 550(A) Of The Bankruptcy Code (against all Defendants)

146.    The Trustee restates and realleges paragraphs 1 through 114 of this Complaint as though fully set forth herein.

147.    On or within two years prior to October 20, 2008, the Debtors transferred more than $68 million to or for the benefit of Defendants.  A schedule of those transfers is attached as Exhibit 10.

148.    Each transfer constituted a transfer of an interest of the Debtor in property.

149.    On the date of each transfer, Debtors received less than a reasonably equivalent value in exchange for the transfer.

150.    At the time of each Transfer, Debtors: (a) were insolvent or became insolvent as a result of the Transfer; (b) were engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; or (c) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

151.    Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee is entitled to avoid any transfers made to or for the benefit of Bell and/or LIM during the two years prior to the petition date.

152.    Pursuant to 11 U.S.C. § 550(a)(1), the Trustee is entitled to recover any such transfers, or the value thereof, avoided pursuant to this Count.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court grant him the following relief against Defendants:

A.    Award damages in an amount to be determined at trial but no less than $1.5 billion, the amount the Funds loaned to Thousand Lakes that has not been repaid.

B.    Order Defendants to disgorge and return to Debtors all fees, compensation, performance allocations, or any other payments of any kind received directly or indirectly from the Funds since their inception.

      C.      Award such other relief as the Court deems appropriate and just.

Dated:  December 7, 2009               Respectfully submitted,

Ronald R. Peterson                  RONALD R. PETERSON, not
Terri L. Mascherin                  individually but as Chapter 7
Sarah Hardgrove-Koleno             Trustee for Lancelot Investors
Jason J. Green                      Fund, L.P., *et al.*
JENNER & BLOCK LLP
353 North Clark Street              By: /s/ *Ronald R. Peterson*
Chicago, Illinois  60654-3456
Telephone:  (312) 222-9350          One of His Attorneys
Facsimile:  (312) 527-0484

*Counsel for Chapter 7 Trustee*